UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 05-361 (RBW)** |
| | : | |
| v. | : | |
| | : | |
| **GLENN BULLOCK, JR.** | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**GOVERNMENT'S OPPOSITION
TO DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE AND
STATEMENTS**

The United States of America by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes the defendant's Motion to Suppress Tangible Evidence and Statements. The government relies upon the points and authorities set out in this memorandum and at any hearing on this matter.

**FACTUAL BACKGROUND**

On August 26, 2005, at approximately 5:30 p.m., Officer Jackson of the Metropolitan Police Department was on routine patrol in a marked scout car when he conducted a traffic stop on the defendant's vehicle in the 2800 block of Alabama Ave, SE, in Washington, DC. The defendant was driving and accompanied by a female seated in the front passenger seat. When Officer Jackson stopped at a traffic light directly behind the defendant's vehicle, he observed the defendant eating food and repeatedly glancing back at him through the rearview mirror. After looking at the officer a number of times, the defendant stepped on the gas and made an illegal right turn (turning right despite a clearly displayed "Left Turn Only" sign ) prompting Officer Jackson to initiate the stop.

The defendant bypassed at least one opportunity to pull over and drove into the parking lot of a Kentucky Fried Chicken. As officer Jackson approached the vehicle by foot, he observed the

defendant making "suspicious overt movements toward his crotch area" that were consistent with hiding or retrieving a weapon. When the officer arrived at the driver-side door, the defendant's pants were unbuttoned and his belt was undone. The defendant was shaking and avoiding eye contact with the officer. He could not produce the car's registration or the car owner's last name, despite saying that it belonged to his friend. When the officer turned back to his scout car, the defendant again reached toward his pants and began shifting in the car. At the time of this incident, Officer Jackson had experience with individuals reaching toward their waist in response to police presence and subsequently being found with weapons. He also had dozens of cases of individuals hiding guns in their pants.

After assisting officers arrived, Officer Jackson asked the defendant to exit the vehicle, and initiated a protective patdown search. The officer felt a "hard metallic object" when he patted the inside of defendant's left leg, at which point the defendant turned his body away from the officer. The defendant said the object was a money clip. The defendant then began moving away from the officers and would not comply with orders to stand still. When the defendant did not comply, officers placed him in handcuffs. Officer Rice then reached into the defendant's pants to locate the hard metallic object, and recovered two bags: (1) a purple Crown Royal bag containing a scale with white powder residue, currency, and plastic baggies; and (2) a clear plastic bag containing more than sixty grams of crack cocaine.

When officers recovered these items, the defendant stated, "You got me. I am not going to try and run. Don't worry. Do you know how hard it is to run with your hands behind your back in cuffs." When officers advised the defendant that he was being charged with Possession with Intent to Distribute Cocaine, the defendant also stated, "I was telling her that I should not have brought this

2

with me. I knew it was not smart." The defendant was transported to the Sixth District, where he waived his rights and gave a videotaped statement in which he admitted possessing the crack for sale.

**ARGUMENT**

**I.    THE TANGIBLE EVIDENCE WAS LAWFULLY SEIZED BECAUSE OFFICERS HAD PROBABLE CAUSE TO CONDUCT A TRAFFIC STOP AND REASONABLE ARTICULABLE SUSPICION TO CONDUCT A TERRY FRISK**

The actions of law enforcement in this case were well justified and in no way violated the defendant's Fourth Amendment rights. The following paragraphs consider each action in the order it occurred.

**1.    Traffic Stop**

Officer Jackson was justified in stopping the defendant's vehicle because he had probable cause to believe that a traffic violation had occurred. Although a traffic stop is a "seizure" of "persons" under the Fourth Amendment and thus must not be unreasonable, "[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." United States v. Whren, 517 U.S. 806, 809-10 (1996). Here, Officer Jackson observed the defendant making an illegal right turn and eating food while driving. Officer Jackson thus had probable cause to believe a traffic violation had occurred and therefore was justified in stopping the defendant's automobile.

Officer Jackson then lawfully ordered the defendant out of the car. In Pennsylvania v. Mimms, 434 U.S. 106 (1997), the Supreme Court established that "a police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle." Maryland v. Wilson, 519 U.S. 408, 410 (1997) (stating the rule of Mimms and extending it to passengers).

This is true even when there is nothing unusual or suspicious about the driver's behavior and the officer has no reason to suspect foul play from the particular driver at the time of the stop. Mimms, 434 U.S. at 109. Here, as explained above, the defendant's car was lawfully stopped because Officer Jackson had probable cause to believe that a traffic violation had occurred. Therefore, under Mimms, Officer Jackson was fully justified in ordering the defendant out of the vehicle as a matter of course.

2. **Terry Frisk**

Officer Jackson conducted a lawful protective patdown search for weapons under Terry v. Ohio, 392 U.S. 1 (1968). Under Terry and its progeny, "a police officer may perform a protective frisk if he has reason to believe, based on 'specific and articulable facts . . . taken together with rational inferences from those facts,' that 'he is dealing with an armed and dangerous individual.'" United States v. Holmes, 385 F.3d 786, 789 (D.C. Cir. 2004) (citing Terry). The officer "need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27; see also United States v. Smart, 98 F.3d 1379, 1384 (D.C. Cir. 1996) ("Further, an officer may frisk such a suspect if the officer has reasonable, articulable suspicion that the suspect in question *may be* armed and dangerous."). This rule recognizes the immediate and weighty interest of officer safety. See Terry, 392 U.S. at 23 ("We are now concerned with . . . the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.").

Numerous factors in this case support a reasonable suspicion that the defendant was armed and presently dangerous. First and foremost are the defendant's furtive movements. The Court of Appeals has stated, "It is well settled that an individual's furtive movements [when undertaken in response to police presence] may be grounds for reasonable suspicion and fear, justifying a Terry stop and search." United States v. Brown, 334 F.3d 1161, 1167-68 (D.C. Cir. 2003) (citing Illinois v. Wardlow, 528 U.S. 119 (2000)). As far back as United States v. Green, 465 F.2d 620 (D.C. Cir. 1972), the Court of Appeals held that officers have a reasonable basis for a protective search when, being "[c]onfronted with a speeding vehicle running a stop sign at 2:00 a.m., they [observe] the driver making furtive movements as though pulling something out of his belt and placing it under his seat." Id. The Court noted that among the many special circumstances that "alert the officer or create in him a reasonable apprehension of danger" is "the situation in which 'an officer notes a suspicious movement by one of the car's occupants as he makes his approach.'" Id.; see also James v. United States, 829 A.2d 963 (D.C. 2003) (upholding frisk on similar facts).

More recently, United States v. Johnson, 212 F.3d 1313 (D.C. Cir. 2000), held that a stop and frisk was justified where the defendant was handed an object in a high-crime area and made several "shoving down" motions in his car in response to police presence, despite orders to show his hands. Id. at 1316-17. "Shoving down" hand motions in response to police presence, the Court of Appeals found, were gestures that "a reasonable officer could have thought were actually suggestive of hiding (or retrieving) a gun." The Court stated that "continued furtive gestures in response to being confronted by a police officer . . . was suspicious enough to support a reasonable belief that [the defendant] was engaged in criminal activity," id. at 1317, and that

5

the officer "obviously had reason to suspect [the defendant] of being armed." Id.

Similarly, in United States v. Holmes, 385 F.3d 786 (D.C. Cir. 2004), the officer was justified in frisking a defendant who reached under his seat during a traffic stop, admitted that he had been drinking, and once out of the car "kept reaching for his back pocket despite continued warnings from the officers." Id. at 789. According to the Court of Appeals, "These circumstances certainly gave [the officer] ample reason to be 'awfully nervous' and 'concerned that [the defendant] could be armed.'" Id.

Applying these precedents to the facts of this case establishes that a reasonably prudent officer in the position of Officer Jackson would be warranted in believing that his safety was in danger. Like the defendants in Green, James, Johnson, and Holmes, here the defendant took repeated actions consistent with hiding a weapon, and he did so in response to police presence. As the officer approached, the defendant was reaching toward the front of his pants. His pants and belt were undone consistent with the theory that he was concealing a weapon therein, and not, for example, retrieving a wallet. His actions did not appear to be motivated by any sort of contact with the female passenger, since the officer did not see any contact between the two, and the defendant was eating food when the officer first pulled behind his vehicle. Just as the officer turned away, the defendant again reached down, this time shifting in his seat. The defendant was unquestionably aware of police presence because the officer was in a marked scout car and effected the traffic stop using emergency equipment. Therefore, as in Green, James, Johnson, and Holmes, here a reasonable person in Officer Jackson's position would be justified in believing that his safety was in danger. In this case, suspicion was further supported by the officer's experience, which included individuals hiding guns in their pants, precisely where the

6

defendant was reaching, and finding weapons on other individuals who had reached toward their waist in response to police presence.

The defendant also gave other indicators of dangerousness. For example, the Supreme Court recognizes that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." Wardlow, 528 U.S. at 124. In addition, peculiar curiosity of police activity can add support to reasonable fear. See United States v. Brown, 334 F.3d at 1167. This is because the possibility of a violent encounter between an officer and a driver "stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop," and the motivation of the driver "to employ violence to prevent apprehension of such a crime." Wilson, 519 U.S. at 414. Here, it appeared that the defendant was hiding evidence of a more serious crime. He displayed a peculiar curiosity, discomfort, and nervousness in response to police presence. Not only did he repeatedly look back at the officer, but he also made an illegal right turn, by-passed one opportunity to pull his car over, avoided eye contact with the officer, and was visibly shaken when pulled over. Coupled with his reaching motions, this behavior suggested wrongdoing and concealment. Accordingly, Officer Jackson had reason to suspect that the defendant might employ violence.

Moreover, reasonable fear is further supported when suspicious behavior is consistent with a hypothesis of armed criminal activity. See Terry, 392 U.S. at 28. In Terry, for example, where the facts supported a hypothesis that the defendant was involved in a daylight robbery, it was reasonable to assume he had a weapon. Id. Here, facts supported a suspicion of car theft. The defendant could not produce a registration, nor even the car owner's last name, who the defendant first claimed was his friend and selling him the car. This, together with defendant's

other evasive behavior, warranted a belief that the car was recently stolen. Accordingly, Officer Jackson could have reasonably assumed the driver was armed.

Finally, the possibility of innocent explanation or coincidence does not change the reasonableness of the suspicion, see Wardlow, 528 U.S. at 124; see also Brown, 334 F.3d at 1167, nor does the officer's personal motivation or subjective intent. Holmes, 385 F.3d 786, 790. Instead, "the propriety of a search under the Fourth Amendment depends on 'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time.'" Id. (citing Scott v. United States, 436 U.S. 128 (1978) and Whren, 517 U.S. 806 (1996)). And in this regard, in light of all the facts known to Officer Jackson, it cannot be said that the decision to pat-down the defendant was "the product of a volatile or inventive imagination, or was undertaken simply as an act of harassment." See Terry, 392 U.S. at 28 (describing a stop and frisk that would fall short of reasonable suspicion). Rather, the facts support a reasonable suspicion that the defendant was armed and dangerous.

3. **Seizure of the Scale, Currency, and Crack Cocaine**

Officers recovered the two bags containing a scale, currency, and crack cocaine pursuant a lawful protective frisk under Terry v. Ohio. The controlling law is United States v. Holmes, 385 F.3d 786 (D.C. Cir. 2004). In Holmes, the Court of Appeals held that an officer who detected a "hard, square object" in the defendant's pocket during the course of a pat-down acted reasonably in removing it despite a personal belief that the object was a digital scale and not a firearm. Id. at 790-91. The Court explained that the propriety of a search depends on an objective assessment of the facts confronting the officer at the time; that the Fourth Amendment does not require officers to gamble their safety on the accuracy of assumptions; and that a Terry

8

frisk is not limited to guns, but includes "concealed objects which might be used as instruments of assault"–which as a category includes "small, square objects." Id.  Thus, the Court held, despite the officer's subjective belief, a reasonable officer knowing the facts–that the defendant was hesitant to pull over, had repeatedly reached under his seat in the vehicle, had been drinking, and once out of car kept reaching for his pocket–would have been justified in removing the scale. Id.

      The facts supporting lawful seizure are even greater in this case.  Like Holmes, here the defendant committed traffic violations, did not take the first opportunity to pull over, made repeated reaching motions consistent with hiding or retrieving a weapon, and outside the car did not comply with the officers' commands.  Likewise, here the officer detected an object during the course of the Terry frisk that turned out to be a scale.  But in addition to these facts, defendant Bullock also physically reacted when the officer detected the concealed object.  When Officer Jackson felt the "hard metallic object," the defendant "tried to turn around" on him, and then "tried to move down the car" away from the officers.[1]  Moreover, defendant Bullock appeared to have even closer access to a weapon because he was concealing or accessing something directly on his person, as opposed to the defendant in Holmes who was reaching under the seat.  Therefore, under the principles set forth in Holmes, a reasonable officer knowing what Officer Jackson knew at the time of the seizure would have been justified in removing the bags from area where the small metallic object was detected.  Accordingly, there was nothing unlawful about the seizure, and the tangible evidence recovered is admissible at trial.

---

[1] P.D. 163 of Officer Jackson.

**II.     DEFENDANT'S ON-SCENE STATEMENTS WERE NOT THE PRODUCT OF INTERROGATION, AND HIS SUBSEQUENT CONFESSION FOLLOWED A VOLUNTARY, KNOWING, AND INTELLIGENT <u>MIRANDA</u> WAIVER.  BOTH THEREFORE ARE ADMISSIBLE**.

1.     <u>On-the-Scene Statements</u>

The defendant argues that his statements should be suppressed, contending they were obtained in violation of <u>United States v. Miranda</u>, 440 U.S. 934 (1966).  <u>Miranda</u>, of course, provides that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  <u>Id</u>. at 444.  These procedural safeguards, the <u>Miranda</u> warnings, however, are only required when the accused is in custody and subject to state interrogation.  <u>Illinois v. Perkins</u>, 496 U.S. 292, 297 (1990).

Even though officers put no questions to him, the defendant contends in his suppression motion that he was subject to interrogation when he made statements at the scene.  In support of this proposition the defendant appeals to <u>Rhode Island v. Innis</u>, 446 U.S. 291, 299 (1980), which held that "<u>Miranda</u> safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent," and defines the functional equivalent of interrogation as "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."  <u>Id</u>. at 300-01.  A closer read of <u>Innis</u> forecloses this argument, however, as the Court went out of its way to warn against such expansive readings of "interrogation."

First, <u>Innis</u> specifically excluded certain police words and actions from the definition of interrogation. For example, police words and actions—even those that are likely to elicit an incriminating response—will not constitute interrogation if they are "normally attendant to arrest and custody." <u>See id</u>. at 301 ("[T]he term 'interrogation' [refers] . . . also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."). Here, defendant Bullock spoke when officers recovered evidence from his person, and when they advised him of the charges. These are precisely the kinds of words and actions that are "normally attendant to arrest and custody." Therefore, under <u>Innis</u>, they cannot amount to interrogation.

Second, the only practices suggested by the <u>Innis</u> Court as possible functional equivalents of interrogation were "techniques of persuasion" such as coached-witness line-ups (in which witnesses are coached to identify the defendant as the perpetrator), reverse line-ups (in which witnesses are coached to identify defendants as perpetrators of fictitious crimes in hopes of securing confessions to real crimes), positing the guilt of the subject, minimizing the moral seriousness of the offense, and casting blame on the victim. <u>Id</u>. at 299. Defendant Bullock now asks this Court to find the routine practices of recovering evidence and advising an accused of charges to be "techniques of persuasion" of the same magnitude. Not only does recovering evidence from the presence of an accused fail to qualify as a "technique of persuasion," but also, it does not even qualify as an action officers know is likely to elicit an incriminating response. <u>See</u>, e.g., <u>United States v. Samuels</u>, 938 F.2d 210, 214 (D.C. Cir. 1991) (Removing picture of son from defendant's bag "was not functional equivalent of questioning because the officers would

not have known that such action 'was reasonably likely to elicit an incriminating response'" from the defendant.).

Third, <u>Innis</u> resoundingly affirmed the admissibility of volunteered statements: "'Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." <u>Id.</u> at 299-300 (citing <u>Miranda</u>). Defendant Bullock's statements are classic examples of volunteered statements; officers did not ask him any questions, nor say or do anything reasonably likely to elicit an incriminating response. The officers' actions in this case are simply not the concern of <u>Miranda</u>. See <u>Innis</u>, 446 U.S. at 299 ("The concern of the Court in <u>Miranda</u> was the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination."). Accordingly, the defendant's statements are admissible.

**2.    Confession**

At the Sixth District, the defendant gave a second set of statements in which he admitted possessing the crack cocaine for sale. These statements are admissible because the defendant waived his rights under <u>Miranda</u>.

<u>Miranda</u> holds that "'[t]he defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly, and intelligently.'" <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986) (citing <u>Miranda</u>). As <u>Burbine</u> further explains, "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to

use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." Id. at 422.

In this case, there is no question that the waiver was voluntary, knowing, and intelligent. Only one detective interviewed the defendant. The interview lasted approximately fifteen minutes. Questioning was not prolonged, nor was the interrogation repeated. The detective–speaking in a normal, even tone throughout–began the interview by informing the defendant of his rights. The defendant signed a written waiver stating that he knew his rights, that he wished to answer questions, and that he was willing to answer questions without having an attorney present. He did this by writing "Yes" and signing his initials next to each of these questions. The defendant also acknowledged that he had been informed of his rights on other occasions. The detective did not apply any physical or psychological pressure to elicit the statements. The defendant is thirty-six years old, not a youth, and he has received fourteen years of education. During the interview he did not appear intimidated in any way, at various times declined to answer questions, and even prolonged the interview by asking questions. He was no stranger to the criminal justice system, as his criminal history includes at least fifteen prior contacts with law enforcement. In light of these facts, it cannot be said that the defendant's free will was overborne, or that he was unaware of his rights and the consequences of waiving them.[2] Therefore, the defendant's statements are admissible against him at trial.

WHEREFORE, for the reasons stated above, the defendant's Motion to Suppress Tangible Evidence and Statements should be denied.

---

[2] If, assuming arguendo, any statement were found to be obtained in violation of Miranda, it would nevertheless be admissible for impeachment purposes if evidence demonstrated that the statement was made voluntarily. See Harris v. New York, 401 U.S. 222, 224-26 (1971).

Respectfully submitted,

KENNETH L. WAINSTEIN.
United States Attorney
Bar No. 451058

_____

BRIAN P. ROGERS
Special Assistant United States Attorney
Federal Major Crimes Section, Maryland Bar
555 4th Street, N.W., Room 4712
Washington, DC 20530
(202) 616-1478